IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SAMUEL BRENT HILL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 1:17CV1047 |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Samuel Brent Hill ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed his application for Supplemental Security Income Benefits on January 31, 2014, alleging a disability onset date of January 26, 2010. (Tr. at 29, 212-20.)[1] He later amended his alleged onset date to his application date. (Tr. at 29, 31.) Plaintiff's application was denied initially (Tr. at 110-27, 147-51) and upon reconsideration (Tr. at 128-46, 152-56). Thereafter, Plaintiff requested an administrative hearing de novo before an

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #8].

Administrative Law Judge ("ALJ"). (Tr. at 157-59.) Plaintiff, represented by an attorney, attended the subsequent video hearing on October 5, 2016, at which an impartial vocational expert also appeared and testified. (Tr. at 29.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act from his alleged onset date through November 21, 2016, the date of the administrative decision. (Tr. at 39.) On September 29, 2017, the Appeals Council denied Plaintiff's request for review of this decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

2

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since January 31, 2014, his application date. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative disc disease, a panic disorder/anxiety, depression, and a bipolar disorder II[.]

(Tr. at 31.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 32.) The ALJ therefore assessed Plaintiff's RFC and determined that he could perform light work, but "needs to use a cane to walk distances greater than five to ten feet." (Tr. at 33.) The ALJ also included the following additional limitations in the RFC:

5

> [Plaintiff] is occasionally able to climb ladders/ropes/scaffolds, and is frequently able to climb ramps/stairs, kneel, crouch, crawl, balance, or stoop; and should avoid concentrated exposure to hazards. The undersigned further concludes [that Plaintiff] is limited to understanding/remembering/carrying out unskilled simple routine repetitive tasks, to making judgments for unskilled work, to interacting with co-workers/supervisors occasionally in brief intervals, to interacting with the public infrequently in brief intervals (as in less than occasional), in work environments with stable work settings and limited social contact.

(Tr. at 33.) The ALJ found at step four of the analysis that Plaintiff had no past relevant work. (Tr. at 37.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in the national economy. (Tr. at 38.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 38-39.)

Plaintiff now raises two related challenges to the ALJ's decision. Specifically, he contends that the ALJ erred (1) by failing to include Plaintiff's "bilateral leg pain secondary to a psychological disorder" as a severe impairment, and (2) by failing "to provide a logical bridge between the evidence and his conclusions regarding [Plaintiff's] RFC." (Pl.'s Br. [Doc. #14] at 5.) Because, as explained below, the consideration of the ALJ's alleged error at step two necessarily extends to the analysis at subsequent steps, including the RFC assessment, the Court considers Plaintiff's contentions in tandem.

At step two of the evaluation process, a plaintiff must establish a "severe impairment," that is, an impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical

6

or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. § 404.1508.[4] A non-severe impairment is defined as one that "does not significantly limit [a plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The Plaintiff bears the burden of establishing severe impairments at step two.

Step two of the sequential analysis is essentially a threshold determination of whether a claimant has a severe impairment (or combination of impairments) significantly limiting his ability to do basic work activities. If a claimant does not have any severe impairment or combination of impairments, the claimant is determined not to be disabled at step two, and the sequential analysis need not progress further. See 20 C.F.R. § 404.1520(a)(4)(ii). However, if the claimant does have a severe impairment or combination of impairments, the sequential analysis continues, and the ALJ must consider the effects of both the severe and non-severe impairments at subsequent steps of the process. Thus, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted). Therefore, in considering the alleged error at step two in this case, the Court also considers the ALJ's analysis at subsequent steps in the sequential analysis.

Here, at step two, the ALJ identified Plaintiff's degenerative disc disease, panic disorder/anxiety, depression, and bipolar disorder as severe impairments. He also expressly

---

[4] These regulatory provisions have been amended, effective March 27, 2017. Because the ALJ's decision in this case was issued November 21, 2016, the Court applies the regulations in effect at the time of that decision.

7

determined that Plaintiff's "scarring from a ruptured eardrum with hearing loss, elevated blood pressure, history of obsessive-compulsive disorder (ODD), gout, neuropathy/leg pain, and history of schizophrenia are not severe, since they do not cause any significant functional or work-related limitations." (Tr. at 31.) However, Plaintiff now argues that the ALJ erred by failing to mention "the diagnosis of bilateral leg pain secondary to a psychological disorder." (Pl.'s Br. at 6.) Plaintiff further contends that "the ALJ's failure to discuss this impairment at Step 2 makes it impossible to determine if the ALJ considered the effect of this impairment on [Plaintiff's] RFC or took it into account when analyzing [Plaintiff's] mental impairments." (Id.)

Plaintiff's arguments ignore several crucial facts. Chief amongst these is the fact that no medical provider ever diagnosed Plaintiff with "bilateral leg pain secondary to a psychological disorder." Plaintiff began complaining of burning sensations and numbness of the bilateral legs and feet following the removal of a kidney stone in June 2012, and he identified the surgery as the source of his symptoms. (See Tr. at 508-510, 657, 692.) Dr. Boggs and Dr. Lovan, both neurologists at the Downtown Health Plaza, evaluated Plaintiff for neuropathy on April 4, 2013. Plaintiff's examination at that time revealed full and symmetric muscle strength, tone, and bulk in both his upper and lower extremities, normal reflexes, and intact sensation. (Tr. at 435-36.) Dr. Lovan's notes reflect the following assessment:

> I cannot find a loss of sensation in his exam and his history does not sound consistent with a neuropathy. [His] reflexes are intact and I do not suspect any AIDP/CIDP. I do not suspect any radiculopathies or myelopathies based on exam. However will do some simple labs to rule out any common causes of neuropathy. As the patient is very concerned, will offer him NCS/EMG for definitive diagnosis as to whether he has a neuropathy or not. In the meantime will start gabapentin which can potentially help with symptoms. Discussed if

> these evaluations are normal, he will likely need to get back with a psychiatrist to discuss non organic causes of his symptoms.

(Id.) Plaintiff underwent an extensive EMG examination on May 10, 2013, with the following conclusion: "This is a normal study without evidence of neuropathy." (Tr. at 657.) Plaintiff "was very frustrated with this and expressed his anger at being told his pain 'doesn't exist because it isn't on some paper or in some chart.'" (Tr. at 657.)

Nearly a year later, on April 25, 2014, Dr. Mark Fields performed a consultative examination during which Plaintiff gave his relevant history as follows:

> [Plaintiff] reports feeling a "pins and needles" sensation in both feet constantly for the last year along with numbness in both hands that is fairly constant. Neuropathy was diagnosed a year ago and [Plaintiff] was told this was a result of low B12 levels. He undergoes B12 injection every two weeks, which have so far been ineffective. The paraesthesias hamper his ambulatory activities and also disturb his sleep. Because of the hand numbness he has difficulty securely grasping items resulting in frequent drops.

(Tr. at 641.) Based on Plaintiff's representations, Dr. Fields included "Lower extremity neuropathy" among Plaintiff's diagnoses. (Tr. at 643.) Upon exam, Dr. Fields also noted "negative sensation to light touch in the left hand and both lower extremities," along with an antalgic gait. (Tr. at 643-44.) Despite Plaintiff's hand complaints, he retained 4/5 grip strength and upper extremity strength and could "manipulate[] small objects, buttons, [and] doorknobs, and [could] pinch with either hand." (Tr. at 643.)

In August 2014, Plaintiff again sought evaluation for his leg pain, this time from Dr. Tyler Severson, an internist at the Downtown Health Plaza. Plaintiff described his pain severity as 10/10 and again attributed it to his kidney stone removal. (Tr. at 656-61.) Dr. Severson's assessment was as follows:

1. **Likely false history, likely 2/2 psychological disorder**

It is important to establish that there is reason to doubt/question much of what the patient reports. . . . [5]

Possible motivations:

1. Drug seeking. I am not convinced this is the case simply because the patient never asked me for any narcotics. He seems to have gone the last two years without even once receiving them. He was not even shaken by the fact that I told him I would not be giving him pain medications yet.
2. Disability seeking. He is trying to get on disability. His initial application was denied, but he is appealing the decision. He was not particularly pushy about disability with me today, but this remains a possibility.
3. Psychological problems. The patient self-reports several psych diagnoses, including panic disorder, severe depression, and OCD. He has, as seen above, tendency to create stores, even when they do not benefit him directly. The question remains whether or not he believes his own stories (that is, if he has actually created pain in his legs) or if he just feels the need to convince others as part of a condition. He has been seen by psychiatrists at UNC-Greensboro, and I would really like to see their records.

. . . .

2. **Leg pain, likely 2/2 psychological disorder**

Assessment: The patient is either in real pain or puts on a very good show. Observation of his gait showed a very painful, slow, limping movement that required supporting himself against the wall. Physical exam (including neuro exam) was completely unremarkable except for [Plaintiff's] sounds of pain. Likelihood of this being a legitimate neuropathy are very low at this point (unlikely origin, bizarre non-dermatomal distribution, negative EMG, no

---

[5] Dr. Severson did not question whether Plaintiff had undergone laser lithotriphsy (Tr. at 656), but did not note that there was no record of laser lithotripsy *causing nerve damage*, or of cystourethroscopy/ureteroscopy *having any complication severe enough to cause bilateral nerve damage to the legs* (Tr. at 659-60). Dr. Severson also specifically noted the following:

> **From provider note in 2012**: Re his PMH, states he had lung [cancer] in 2011 for which he is [status post] resection. However, there is no evidence of this on CT scan and he has no scars [consistent with] this on exam. He thinks that he had a chest tube at that time but he has no scars for this and when asked to point to where the chest tube was he pointed to his extreme lower back. He further stated that he received 2 rounds of chemo for this and that he was supposed to get more but was unable to afford it. However, at his last follow up visit with that doctor, he was told that he did not need any more tx after all. He does not know the name of the physician that provided this care but states that she was Russian and recently moved back there.

Plaintiff gave a similar history to the consultative examiner, who relied on that report in diagnosing Plaintiff with "History of lung cancer status post partial lung resection" and "Exertional dyspnea." (Tr. at 643.) At the hearing, Plaintiff testified that he had both lung cancer and testicular cancer that were removed by a Russian doctor at a hospital in Greensboro, but that the records were not available from the hospital because the Russian doctor went back to Russia and took all the records with her. (Tr. at 106.)

10

neurological deficits). My personal opinion is that [Plaintiff] is in real pain, but I do not believe it is related to nerve damage; likely psychological in origin.

(Id.) Notably, as the source of Plaintiff's pain remained uncertain, Dr. Severson's diagnoses simply include "Leg pain, bilateral," rather than neuropathy or a psychological disorder. (Tr. at 661.) At Plaintiff's six-week follow-up appointment on September 26, 2014, Drs. Dorsey and Cengia, both physicians at the Downtown Health Plaza, essentially reiterated Dr. Severson's findings. Dr. Dorsey also noted that Plaintiff had recently begun psychiatric treatment, and that it was his opinion that Plaintiff's pain was "psychiatric in nature and that psychiatric treatment is most promising for pain reduction and resolution." (Tr. at 704.) Dr. Cengia noted that Plaintiff's "symptoms have been favored to be psychogenic in nature. Will refer to Neurology for follow up at patient's request and advised continued care with his psychiatrist." (Tr. at 701.)

Plaintiff's treatment notes from a subsequent March 31, 2015 examination by Dr. Alison Snider again list a diagnosis of "Leg pain, bilateral," and specify that the pain is of "unclear etiology." (Tr. at 692.) Dr. Snider noted that Plaintiff was still convinced the leg pain was a result of his kidney stone surgery, but "[i]n reviewing through the records, neurology felt there was some almost conversion disorder sxs with no basis to his sxs and normal NCS." (Tr. at 692.) Dr. Snider saw Plaintiff again three months later, on July 20, 2015, and again noted a diagnosis of "Leg pain, bilateral" of "Unclear etiology," and that "we spoke of how I really don't think the answer is further testing/workup as everything has been negative and instead focus on ways we can alleviate his pain and work with psychiatry to get him on some medications for his depressive sxs." (Tr. at 681.)

11

The Court has set out these treatment records at length because Plaintiff contends that the records reflect a diagnosis of "bilateral leg pain secondary to psychological disorder." However, none of these records include such a diagnosis. Instead, the records reflect that Plaintiff's neurologists and other medical providers could determine no neurological cause for his symptoms, and entertained various possibilities, including the possibility of a psychological condition, as the basis for the unexplained leg pain. They did not diagnose or treat him for that possibility, and instead referred him to mental health treatment providers to explore this matter further.[6]

Plaintiff did seek mental health treatment, but it does not appear that Plaintiff's mental health providers ever addressed the possibility of a non-organic cause for his pain. Even in Plaintiff's most recent mental health treatment notes from 2016, his providers still reference Plaintiff's ongoing physical issues, leg pain and "neuropathy," without connecting these issues to his psychological condition, other than as stressors exacerbating his depression, panic disorder, and/or OCD. (See, e.g., Tr. at 719, 725, 732.) In short, no medical provider identified any definitive physical or mental basis for Plaintiff's allegedly disabling leg pain or identified any limitations therefrom.[7]

---

[6] As Defendant correctly notes, Plaintiff "did not allege a somatoform/conversion disorder in his application for benefits, and in the pre-hearing representative brief filed by Plaintiff's counsel in September 2016, counsel did not mention a somatoform/conversion disorder, but rather urged the ALJ to evaluate Plaintiff's (organic) neuropathy pursuant to Listing 11.14." (Def.'s Br. [Doc. #16] at 12) (citing Tr. at 110, 330-31). Moreover, while Plaintiff's physicians observed that there were "some almost conversion disorder [symptoms]" or somatoform pain (Tr. at 692, 660), as the Court notes above, there is no evidence that Plaintiff was ever diagnosed with or treated for such a disorder.

[7] The Court also notes that to the extent Dr. Severson entertained three possibilities: drug-seeking, disability-seeking, or psychological problem, Plaintiff's mental health records reflect that his providers noted concerns that Plaintiff was fixated on obtaining disability. (Tr. at 741, 742.) In December 2014, only four months after Dr. Severson posed his three possible motivators, Plaintiff's mental health treatment provider noted that:

12

Based on the above medical evidence, the ALJ gave Plaintiff the benefit of the doubt by including "neuropathy/leg pain" among his impairments, but he further found that this impairment was non-severe. The remaining issue is whether the ALJ sufficiently considered the limitations stemming from Plaintiff's leg complaints—regardless of whether those complaints found their source in an organic or non-organic condition—when assessing Plaintiff's RFC. Plaintiff argues that "the ALJ should have included an additional limitation to account for the impact that [Plaintiff's] bilateral leg pain would have on his ability to stand or, in the alternative, explain why [Plaintiff's] bilateral leg pain would not result in a limitation in his ability to stand beyond the limitation to light work activity." (Pl.'s Br. at 12.) This contention ignores the lack of any evidence, other than Plaintiff's own subjective complaints, that Plaintiff's alleged leg pain causes *any* work-related limitations.

Significantly, the ALJ's RFC assessment, as written, encompasses the most restrictive physical limitations opined by the medical providers in this case. Dr. Jagjit Sandhu, the State agency physician at the initial level, posited in June 2014 that Plaintiff would perform light work, climb ladders, ropes, and scaffolds occasionally, and balance, kneel, crouch, and crawl frequently. (Tr. at 37, 119-21.) The ALJ assigned this opinion great weight and fully adopted Dr. Sandhu's findings in crafting the RFC. (See Tr. at 33.) Plaintiff now contends that the ALJ's relied on Dr. Sandhu's opinion erroneously because it predates Plaintiff's alleged neuropathy diagnosis. However, the ALJ specifically concluded that the later medical

---

> Patient reluctant to use CBT tools to work on his anger, panic, depression. Seems hyperfocused only on attaining DSS financial supplement to income. Believe this may be his only reason for coming to counseling.

(Tr. at 739.) In his decision, the ALJ noted Dr. Serverson's observation that Plaintiff "might have been demonstrating disability-seeking behavior." (Tr. at 36.)

13

treatment notes "do not support a finding that the claimant's condition is materially worse than it was at the time the opinions were rendered." (Tr. at 37.) Plaintiff identifies no objective evidence of his worsening condition after mid-2014. Instead, he points to "the ALJ's inclusion of a cane for any walking greater than 5 to 10 feet in the RFC [as] effectively admit[ting] progression of [Plaintiff's] physical impairments." (Pl.'s Br. at 19.) In fact, in adopting this limitation, the ALJ appears to have given Plaintiff the benefit of the doubt by acknowledging Plaintiff's use of a cane during at least one medical appointment. (See Tr. at 680.)[8] As acknowledged in the ALJ's decision, the consultative examiner, Dr. Fields, also noted that Plaintiff experienced some difficulties with ambulation and other physical activity, due to his gout and back pain. (Tr. at 35, 643-44.) Plaintiff fails to point to any evidence that further limitations stemming from his leg pain, and particularly the standing limitations he now suggests, were required. To the extent that Plaintiff now relies on his subjective symptom allegations as the basis for additional limitations, he raises no challenge to the ALJ's finding that his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," particularly the largely normal findings with regard to Plaintiff's lower extremity strength, reflexes, and sensation, as discussed at length above.

---

[8] At the appointment in question, Dr. Snider noted that Plaintiff "remains frustrated by his inability to get disability 2nd to his severe leg pains and burning. He feels he is unable to work as he can barely walk at times 2nd to his leg pains." (Tr. at 680.) Plaintiff reported that "[h]e has to constantly move his legs due to the pain and has to limp to the point that 'he can barely get around anymore' and now walks with a cane. He predominantly limps on the right side, but sometimes 'has to switch it up and limp on the left side.' . . . He is upset that he constantly has to 'prove himself' to doctors of his condition." (Tr. at 680.)

14

Regarding Plaintiff's additional claim that "the ALJ's failure to discuss this impairment at Step 2 makes it impossible to determine if the ALJ considered the effect of this impairment on [Plaintiff's] RFC or took it into account when analyzing [Plaintiff's] mental impairments" (Pl.'s Br. at 6), Plaintiff points to no evidence of how his alleged neuropathy would affect his mental RFC. As noted above, no medical professional officially diagnosed, let alone treated, Plaintiff for a conversion disorder, somatoform disorder, or any other psychological disorder relating to his leg pain. In addition, Plaintiff asserted prior to his hearing and before the ALJ that his neuropathy was a physical, rather than a mental, impairment, and he styles this disorder as "bilateral leg pain secondary to a psychological disorder" for the first time before this Court. Plaintiff cannot fault the ALJ for failing to specifically address a diagnosis that was never made and that Plaintiff never proffered for consideration.

Moreover, as noted above, the ALJ took all of the impairments into account in setting the RFC, including Plaintiff's neuropathy/leg pain and Plaintiff's mental impairments. For example, in considering the RFC, the ALJ noted that Plaintiff "complained of limitations in sitting, standing, concentrating, interacting with others, and functioning caused by [] leg/feet neuropathy, OCD, anxiety, a limping gait, gout flare-ups, a lack of energy, panic attacks, paranoia, nocturnal sleep disturbance, and severe depression. However, the medical evidence established the claimant was able to function even with his impairments." (Tr. at 35.) The ALJ then addressed at length the medical records, the consultative examinations, and the state agency conclusions supporting this conclusion as reflected in the RFC determination.

Finally, the Court notes that Plaintiff also contends that the ALJ failed to "provide a logical bridge between the evidence in the record, the RFC findings, and his conclusions

15

regarding the consistency of [Plaintiff's] allegations with the evidence in the record." To the extent that Plaintiff again contends that the ALJ failed to address his "bilateral leg pain secondary to a psychological disorder," the Court has fully addressed that issue above. To the extent Plaintiff challenges the ALJ's analysis of his mental impairments, the ALJ relied on Dr. Hinson's consultative examination, the records from Plaintiff's counselors, and the opinions of the state agency physicians, and explained at length how each of those pieces of evidence supported the RFC determination. (Tr. at 36-37.) To the extent Plaintiff challenges the ALJ's handling of the Disability Reports prepared by Plaintiff and by his mother, the ALJ considered the daily activities reflected in the initial reports, but did not accept the remainder of the reports for the reasons set out in the decision, including that they were not supported by the medical evidence. Plaintiff does not point to any medical evidence that would support the information in the disability reports; indeed, none of Plaintiff's treating physicians or counselors gave any indication that he was disabled or limited as alleged, and none of the medical testing supports Plaintiff's claims.

To the extent that Plaintiff essentially asks the Court to re-weigh the evidence and come to a different conclusion than the ALJ, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. Thus, the issue before the Court is "whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained the decision, and supported that explanation with substantial evidence. Accordingly, the Court finds no basis for remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #13] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #15] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 25th day of February, 2019.

/s/ Joi Elizabeth Peake
United States Magistrate Judge